Desmond, J.
Under review in this case is the denial to petitioners, by the Regents, of a license to exhibit in New York State a motion picture called “ Garden of Eden”. The film, which this court has viewed, is a fictionalized depiction of the activities of the members of a nudist group in a secluded private camp in Florida. There is nothing sexy or suggestive about it. It has been shown in 36 States and in many foreign countries. In it the nudists are shown as wholesome, happy people in family groups practising their “ sincere if misguided theory that clothing, when climate does not require it, is deleterious to mental health by promoting an attitude of shame with regard to natural attributes and functions of the body” (American Law Institute, Model Penal Code, Tentative Draft No. 6, p. 35).
The pictured episodes are ‘1 honestly relevant to the adequate expression of innocent ideas ” (United States v. Kennerley, 209 F. 119,120-121) just as are figures of nude men and women in the decor of public buildings including New York court houses, and in the pages of National Geographic Magazine and *240 in ultra-respectable travel pictures. Nevertheless, the Motion Picture Division of the New York State Education Department rejected the film (and respondents Board of Regents confirmed the rejection) on the ground that it is “indecent”. These censors, however, did not declare it to be obscene as, indeed, they could not. We will not in this opinion quibble or quarrel as to concepts of decorum or delicacy or manners, since ‘1 the court is not a censor of plays and does not regulate manners ” (People v. Wendling, 258 N. Y. 451, 453). We need not reassert our deeply felt conviction that censorship for real, true obscenity is valid and essential in our society (Legal Problems on Censoring, 40 Marq. L. Rev. 38). But we do say and we will show in this opinion that this picture cannot lawfully be banned since it is not obscene in the sense in which the law has used that term for centuries. Nothing sexually impure or filthy is shown or suggested in ‘ ‘ Garden of Eden ’ ’ and so there is no legal basis for censorship (see People v. Muller, 96 N. Y. 408, 411; United States v. One Book Called “ Ulysses ”, 5 F. Supp. 182, 184; United States v. Limehouse, 285 U. S. 424; American Civil Liberties Union v. Chicago, 3 Ill. 2d 334, appeal dismissed 348 U. S. 979; Roth v. United States and Alberts v. California, 354 U. S. 476, June 24, 1957; and, generally, Lockhart and McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295). Since the film is certaintly not “ obscene ” in the eyes of the law, it cannot, under United States Supreme Court decisions hereinafter listed and binding on us, constitutionally be subjected to prior restraint. To repeat, we are not called upon to pass judgment on nudism or nudists. We are simply obeying the supreme law which binds us as well as everyone else. So confining ourselves and leaving our individual predilections for debate at some more appropriate time, we analyze the applicable law.
Appellants, the Board of Regents of the University of the State of New York, are the policy-making officers of the State Education Department (Education Law, §§ 206, 207). Under sections 122 and 124 of the Education Law the Regents control the licensing and exhibitions of motion pictures in this State and are required to issue such a license unless the film or a part thereof is “ obscene, indecent, immoral, inhuman, sacrilegious, or is of such a character that its exhibition would tend *241 to corrupt morals or incite to crime ” (Education Law, § 122; and see § 122-a thereof for further or sub-definitions of “ immoral ” and “ tend to corrupt morals ”). By a series of decisions handed down during the last five years (Joseph Burstyn, Inc., v. Wilson, 343 U. S. 495; Gelling v. Texas, 343 U. S. 960; Superior Films v. Department of Educ. and Commercial Pictures Corp. v. Regents, 346 U. S. 587; Holmby Prods, v. Vaughn, 350 U. S. 870), the United States Supreme Court has stricken down as unconstitutional nearly all the grounds for license refusal listed in sections 122 and 122-a of the New York Education Law (supra). Those cited decisions of the United States Supreme Court need not be separately analyzed here. Their cumulative result is that a motion picture may not be denied license by State censors because it is “ immoral ” or because it is “ sacrilegious ” or “ because its exhibition would tend to corrupt morals or incite to crime ”. As to denial because of obscenity, the Burstyn majority opinion (343 U. S. 495, 505, supra) said that the court found it unnecessary “ to decide, for example, whether a state may censor motion pictures under a clearly drawn statute designed and applied to prevent the showing of obscene films.” Becognizing in that language the customary conservatism of high court opinions, we treat it as a holding that obscenity is under the First and Fourteenth Amendments the only (other possible exceptions are not pertinent here) lawful ground for denying a license. That such is the meaning of the Burstyn excerpt (supra) is more than a guess. It is solidly based on the history of censorship, recent and remote (Brown v. Kingsley Books, 1 N Y 2d 177, 189, 190; St. John-Stevas, Obscenity and the Law, Legal Problems Involved in Censoring, 40 Marq. L. Rev. 38; Censoring the Movies, 29 Notre Dame Law. 27).
Another Supreme Court expression as to obscenity, Butler v. Michigan (352 U. S. 380 [Feb., 1957]), narrowed even more the permissible range of governmental action. Held invalid in that ease was a Michigan statute (and, presumably, similar statutes in 11 other States not including New York) which made it criminal to distribute to the general public a book containing obscene language “ tending to the corruption of the morals of youth”. The Butler decision (and the series of decisions re obscenity handed down by the court on June 24, 1957) means that in the United States as in England (Regina v. Martin *242 Seeker S Warburg, Ld., [1954] 1 Weekly L. R. 1138) the question of obscenity may no longer be decided by the old Hicklin test (Regina v. Hicklin, L. R. 3 Q. B. 360, 371) of ‘1 whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort may fall.” The law now, since Butler v. Michigan (supra), is that the young may be kept away from certain movies by appropriate State action (cf. New York Penal Law, § 484) but, unless the picture be really obscene in the traditional, historic sense of that term, license to exhibit it to adults may not be withheld.
That obscenity is an exception (and for our purposes the only exception) to the First Amendment’s free speech guarantee was flatly and finally announced by the Supreme Court on June 24, 1957 in Roth v. United States and Alberts v. California (354 U. S. 476, supra). In the Roth-Alberts opinion Justice Brennan wrote that “ obscenity is not within the area of constitutionally protected speech or press.”
Since the Constitution forbids any prior restraint of a motion picture which is not obscene and since this film has not been found to be obscene or rejected because of obscenity and since it is not obscene by any standard we ever heard of, we could end this opinion right here. Nudity in itself and without lewdness or dirtiness is not obscenity in law or in common sense. “ It is a false delicacy and mere prudery which would condemn and banish from sight all such objects as obscene, simply on account of their nudity. If the test of obscenity or indecency in a picture or statue is its capability of suggesting impure thoughts, then indeed all such representations might be considered as indecent or obscene. The presence of a woman of the purest character and of the most modest behavior and bearing may suggest to a prurient imagination images of lust, and excite impure desires, and so may a picture or statue not in fact indecent or obscene ” (Judge Andrews writing in 1884 for a unanimous Court of Appeals in People v. Muller, 96 N. Y. 408, 411, supra). For more than a century the New York courts have held that exposure of the body .to the view of others is not criminal if there be no lewd intent (Miller v. People, 5 Barb. 203 [1849]; cf. People ex rel. Lee v. Bixby, 4 Hun 636, opinion in 67 Barb. 221). Even the strictest moralists tell us that “ an obscene nude is a nude that allures ” (Vermeesch, Theologiae Moralis, 1936, p. 94).
*243 The State, nevertheless, says that the picture “Garden of Eden ” is “indecent ”, that indecent films are censorable under the statute (Education Law, § 122, supra) and that the courts as well as the Regents must obey that law. We will now analyze those positions.
It is settled that “ indecent ”, standing alone and read literally, is much too broad and vague a term to make a valid censorship standard. ‘ ‘ Indecent ’ ’ may include anything from vulgarity or impropriety to real obscenity (State v. Pape, 90 Conn. 98, 101). Since the law does not penalize or proscribe mere breaches of decorum, the word “ indecent ”, to accomplish anything at all, must be read to mean ‘ ‘ obscene ’ ’, and so the New York courts have always defined it. Our court has twice flatly held that the word “ indecent ” as to pictures or books describes “ various phases of the crime of obscenity” and ‘1 that form of immorality which has reference to sexual impurity ” (People v. Eastman, 188 N. Y. 478, 480; People v. Winters, 294 N. Y. 545, 550, revd. on other grounds 333 U. S. 507). The court in the Eastman case was construing the then section 317 of the Penal Code which, somewhat expanded, is now section 1141 of the Penal Law. The statute analyzed in Eastman penalized the distribution of “ any obscene, lewd, lascivious, filthy, indecent or disgusting book * * * picture ”. Our present motion picture censorship statute (Education Law, § 122, supra) forbids the licensing of a motion picture which is “ obscene, indecent, immoral ”. The similarity of wording is patent. Here is what our court said in Eastman as to the meaning of 1 ‘ indecent ”: “ It is clear from the manner in which the legislature has used the word ‘ indecent ’ that it relates to obscene prints or publications; it is not an attempt to regulate manners, but it is a declaration of the penalties to be imposed upon the various phases of the crime of obscenity. The word ‘ indecent ’ is used in a limited sense in this connection and falls within the maxim of noscitur a sociis ” (People v. Eastman, 188 N. Y. 478, 479-480, supra). Thus, “ indecent ” in section 122 means “ obscene ”, this picture is not obscene and so the license denial was unconstitutional.
The whole reason for the board’s proscription of this film seems to be section 1140-b of the Penal Law, passed in 1935: “ A person who in any place wilfully exposes his private parts in the presence of two or more persons of the opposite sex *244 whose private parts are similarly exposed, or who aids or abets any such act, or who procures another so to expose his private parts or who as owner, manager, lessee, director, promoter or agent, or in any other capacity, hires, leases or permits the land, building or premises of which he is the owner, lessee or tenant, or over which he has control, to be used for any such purposes, is guilty of a misdemeanor.” The statute mentions neither movies nor nudism but the State says it is to be read with the censorship law (Education Law, § 122, supra) so as to create in New York a statutory prohibition against the licensing of any motion picture showing a group of nude people of both sexes. That position of the State rests entirely on two assumptions, each of which is demonstrably false. The first assumption (one of historical fact) is that the Legislature, without saying so, intended by section 1140-b to make criminal in New York State any practice of nudism, even in secluded private grounds and by family groups. The second assumption (one of law and based on the false assumption of fact) is that since nudism is criminally “ indecent ” in this State, a pictorial representation of that crime is in itself “ indecent ” and not licensable under section 122 of the Education Law (supra).
First, as to the falsity of the assumption that section 1140-b makes nudism under whatever circumstances criminal in New York. It is true that in the contemporary press and elsewhere the legislation was called “the anti-nudism bill”. But the careful and well-informed Governor who signed it wrote in liis memorandum of approval that it was directed against “ the professional exploitation of nudism for profit ”. The new law was needed, he wrote, to prevent “ exhibitionism for financial gain ” which the existing statutes did not touch (Public Papers of Governor Herbert H. Lehman, 1935, p. 352). In the same message Governor Lehman cryptically referred to the real background and purpose of the new statute when he said: “ There can be no justification for some of the so-called nudist gymnasiums or colonies where the general public is admitted on the payment of an admission fee.” The reference, of course, was to People v. Burke (243 App. Div. 83, affd. 267 N. Y. 571). The Burke case was handed down by our court on April 30, 1935, a few days after the Legislature voted the bill which became section 1140-b (supra). Beyond any doubt, section *245 1140-b was passed because of that Burke decision (for a contemporary discussion of the case and the statute see 69 U. S. L. R. 346 et seq.) Defendant Burke, in the name of the “ Olympian League ”, had rented a gymnasium in New York City and there ran a “meeting” where “ Any one was welcome * * * who would pay the required entrance fee ” (see 243 App. Div. 83, 86) and where the male and female ticket purchasers exercised and swam “ naked in a gymnasium to which admittance [was] gained by the payment of a fee ” (see 267 N. Y. 571, 572). That was the “ professional exploitation ” and “ exhibitionism for financial gain ’ ’ against which the Legislature and the Governor were legislating. Of course, the law is very broadly drawn but our duty is to give it a reasonable and sensible meaning in the light of the evil at which it was directed. Because it is a restraint of liberty and because it creates a crime unknown to the common law (as to the common law of nudity in nonpublic places see 67 C. J. S., Obscenity, §§ 5, 6) it should be narrowly and strictly construed. Literal meaning would penalize not only innocent and orderly nudism but would make it a misdemeanor for a parent and members of a family to be unclad in their family home. No rational Legislature ever intended to create such a crime. The law should be interpreted sanely as penalizing nudity in public or quasi-public places only.
As a last reason why section 1140-b has no bearing at all here, we point out that, whatever that strange enactment may mean, it certainly does not deal with the exhibition of any motion picture. The showing of an “ obscene, lewd, lascivious, filthy, indecent” film is dealt with in a different section —1141 — of the Penal Law. And the test under section 1141 is, as we have seen, “ obscenity ” alone.
But let use suppose that section 1140-b makes criminal any and every practice of nudism in New York State. It is still a non sequitur that picturing such activity becomes criminal or “indecent” or that it justifies censorship. To say that representation of criminal activity is criminal is to abolish the drama and the novel in one stroke. Illustrations are unnecessary. Everyone will think of his own. The showing of crimes in book, play or cinema is evil only when it is done in a dirty way or when it glorifies the criminal act. So to characterize “ The Garden of Eden ” is impossible.
*246 In only four States of the Union (New York, Kansas, Maryland, Virginia) is censorship of motion pictures still carried on by State agencies. The number has been declining and will decline further unless reason and moderation be employed (see Pound, J., in People v. Wendling, 258 N. Y. 451, 454, supra). Some of us, while proclaiming the necessity for “ a viable solution of the problem of censorship by law in a democratic society ” have realized that we must “ eschew the extremes and shun the extremists ” (Legal Problems in Censoring, 40 Marq. L. Rev. 54, supra). We have publicly recognized that “obscenity, real, serious, not imagined or puritanically exaggerated, is today as in all the past centuries, a public evil, a public nuisance, a public pollution ”. We “ see no reason why democratic government should not use democratic processes on a high administrative level, under the control of the courts, to suppress such obscenity ” (same citation). But censorship is a necessary evil, a last resort, to be used only when necessary and limited to the necessity (see Joseph Burstyn, Inc., v. Wilson opinion, 343 U. S. 495, 504, supra). “ Censorship ”, once wrote the great American political thinker Alfred E. Smith, “ is not in keeping with our ideas of liberty and of freedom * # * of speech” (Public Papers of Alfred E. Smith, 1923, pp. 60, 61). “ The point here, as in most problems, is that a minimum of censorship is far more likely to prove beneficial, rather than an attempted maximum ” (Bourke, Moral Problems in Censoring, 40 Marq. L. Rev. 56, 69, 71, 72, 73; see Gardiner, Moral Definitions of the Obscene, 20 Law & Contemp. Prob. 560, 561). In the present case the Board of Regents, doubtless because of a mistaken belief that section 1140-b mandated such action, went far beyond even the permissible maximum of censorship. In the interest of reasonable censorship itself, this unlawful exercise of the censorship power must be overruled by the courts.
The order should be affirmed, with costs.