Henry ROBERTS, John Roberts, Tennessee Outdoor Club, Inc., and the American Sunbathing Association, Inc.

v.

Frank G. CLEMENT, Individually and as Governor of the State of Tennessee, George F. McCanless, Individually and as the Attorney General of the State of Tennessee, and Archie Weaver, Individually and as Sheriff of Knox County, Tennessee.

Civ. A. No. 5410.

United States District Court
E. D. Tennessee, N. D.

Jan. 12, 1966.

Bernard E. Bernstein, Knoxville, Tenn., Dennison & Dennison, Washington, D. C., for plaintiffs.

George F. McCanless, Atty. Gen., William H. Lassiter, Jr., Asst. Atty. Gen., Thomas E. Fox, Asst. Atty. Gen., Nashville, Tenn., Lockett, Slovis & Weaver, Knoxville, Tenn., for defendants.

Before PHILLIPS, Circuit Judge, TAYLOR, District Judge, and DARR, Senior District Judge.

ROBERT L. TAYLOR, District Judge.

Plaintiffs seek a declaration that Chapter 176 of the Public Acts of 1965 (Section 39–3009 TCA) is unconstitutional and an interlocutory and permanent injunction restraining the defendants from enforcement by prosecutions or threatening prosecutions for violations. The Act makes it unlawful for any person to engage in the operation of a nudist colony or to engage in nudist practices in the State of Tennessee. Violations are punishable as misdemeanors. The entire statute, a short one, reads as follows:

"39–3009. *Nudist colony and practices unlawful — Misdemeanor.* — It shall be unlawful for any person, firm or corporation to operate or carry on, or engage in the operation of a nudist colony in this state.

"It shall also be unlawful for any person to engage in nudist practices in this state.

"It shall be a misdemeanor for anyone to violate the provisions of this section, and punishable as such."

Individual plaintiffs are practicing nudists and were employed by co-plaintiff, Tennessee Outdoor Club, Inc., to operate a nudist park under lease by the Club in Knox County, Tennessee. American Sunbathing Association, Inc. is a non-profit organization that serves individual nudists, local and regional nudist organizations, and nudist parks, including Tennessee Outdoor Club, Inc. Corporate plaintiffs sue in behalf of their members to protect the individual constitutional rights of the members.

Plaintiffs contend: That the Act is vague and indefinite; that it violates their rights of expression and association; that it deprives them of property rights and rights of privacy; that their individual liberties have been curtailed in violation of the First, Fifth, Ninth and Fourteenth Amendments to the Constitution of the United States.

Defendant, Frank G. Clement, is the Governor of the State of Tennessee and the defendant, George F. McCanless, is its Attorney General. Defendant, Archie Weaver, is the Sheriff of Knox County, Tennessee.

Jurisdiction is derived from 28 U.S.C. §§ 1331, 1332, 1343 and 2201. A three-judge court was convened pursuant to 28 U.S.C. §§ 2281 and 2284.

Defendants moved to dismiss the complaint upon the ground that plaintiffs do not have any personal, immediate and real interest in the subject matter of the suit and are, therefore, without standing to challenge the constitutionality of the Act.

Defendants agreed at the oral hearing that the affidavits filed by plaintiffs in support of their motion for an injunction should be treated as evidence and that the purported statements of fact therein were true, except that defendants deny the practice of nudism produces healthier children, fewer delinquents and less divorces.

Affiant, Henry Roberts, stated that he was a member of the Tennessee Outdoor Club, Inc., Acting Secretary, and employed as General Manager of the Timberline Club, a nudist park leased by the Tennessee Outdoor Club, Inc.; that he is a practicing nudist and is a member of the American Sunbathing Association, Inc.; that he was employed by the Tennessee Outdoor Club, Inc. on a full-time basis in February, 1965 to come to Knox County, Tennessee to develop and operate a campsite leased by the Club for the private practice of nudism. That he gave up previous employment to undertake new employment with the Tennessee Outdoor Club; that he incurred considerable expense in moving to Knox County, Tennessee for the new employment. That arrangements were made to establish a private park to be known as the Timberline Club. That land leased by the Club consisted of approximately 100 acres of isolated timberland in a remote portion of Knox County, Tennessee. That a portion was to be cleared to provide swimming, parking, recreation and lodging facilities. That the cleared area is surrounded by dense tree growth and brush and is virtually inaccessible except by a privately developed road on the

premises. That as a result of the enactment of Chapter 176 of the Public Acts of Tennessee, March 19, 1965, the development of the Club was terminated and his employment suspended, with resulting loss of income. That he moved to Mays Landing, New Jersey and sought other employment. That the Tennessee Outdoor Club, Inc. was organized as a general welfare corporation under the laws of Tennessee for the purpose of allowing its members to practice nudism privately. That the Club is made up of members throughout the State of Tennessee, as well as adjoining states, and afforded them a secluded area for their practices. That the operation of the Club was in conformity with the standards established by the American Sunbathing Association, Inc. and the Club members used its facilities without creating a nuisance. That nudism is not accepted by many in society but they have a right to believe and to practice their beliefs under constitutional protection. That many of its members would be subjected to economic and social pressures in the community if their identity should become known and all steps are taken to insure the anonymity of its membership. That as a result of the enactment of Chapter 176, the membership of the Club and those who wish to use the facilities have been unable to use them. That they are afraid they will be arrested by local officials should they proceed to use the park in an effort to challenge the state law. That this would result in multiple arrests of each of them and the consequent exposure of their identities, with the resulting sanctions and irreparable injuries.

Affiant, Rose Holroyd, is a resident of Mays Landing, New Jersey, and is employed as Executive Director of the American Sunbathing Association, Inc. She is and has been a practicing nudist for thirty-two years and is married to a practicing nudist. She believes that the practice of nudism is conducive to sound minds and healthy bodies.

The American Sunbathing Association was organized in 1939 under the laws of New Jersey as a successor of the American League for Physical Culture which was founded in 1929. The Association serves individual nudists, local and regional nudist organizations and nudist parks, with a democratic organization through which the aims and feelings of those individuals may be expressed for their mutual benefit. The Association sets up the requirements for its members and for member organizations and nudist parks that are associated with it and insures compliance with these requirements.

Membership in the Association exceeds 15,000, all of whom pay membership fees and make contributions and may purchase materials from the Association. Members of the Association are drawn from all walks of life. The Association assisted its members in Tennessee in establishing the Tennessee Outdoor Club, Inc. as a general welfare corporation in August, 1964. It provided guidance and assistance to the Tennessee Outdoor Club when the Club leased acreage to establish a nudist park. It helped to arrange for the retention of Henry and John Roberts as managers of the proposed park. The effect of the passage of Chapter 176 has caused a decrease in the number of members in Tennessee, a decrease in the normal growth rate of membership from Tennessee in the American Sunbathing Association, Inc., and a decrease in membership fees. Information was received of the social and economic ostracism suffered by the Tennessee residents who spoke out in opposition to Chapter 176 and who asserted the fact that they were nudists and had practiced nudism in the established parks. That as a result of the adverse effects of such publicity, the American Sunbathing Association and Tennessee Outdoor Club cannot expect to grow and increase their membership and activities in Tennessee. That the individual members of the Association who are also members of the Tennessee Outdoor Club and live in Tennessee cannot risk prosecution with its resulting publicity and associated ostracism in an attempt to challenge the constitutionality of the enactment. That the practice of nudism is widespread

throughout the United States. It is estimated that there are 300,000 nudists in the United States and a million throughout the rest of the world. There are 300 nudist parks operating in forty-one states of the United States. The parks serve the needs of their members and are operated under rigid requirements enforcing the privacy of the club without causing any disturbance or nuisance to adjoining landowners. A nudist park serves the needs of its members just as a golf course serves the needs of it members, except the golf course is usually in plain view of everyone whereas the park is isolated from the general public and cannot be viewed without deliberate trespassing. The Tennessee Club would have to maintain standards pertaining to sanitation and health set by the American Sunbathing Association.

■■ Thus, it is shown by the affidavits, as well as by the allegations in the complaint, that the interests of the individual plaintiffs are real and direct and of sufficient economic value to maintain the suit. Also, it is shown that the corporate planitiffs have an economic interest in the loss of dues as well as loss of rental for the leased property and such expenditures that have been made for improvement. Moreover, when civil rights are involved, those rights may be asserted by corporations in behalf of their members. N. A. A. C. P. v. Alabama, 357 U.S. 449, 459, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); N. A. A. C. P. v. Patty, 159 F.Supp. 503, 519 (1958); Grosjean v. American Press Co., Inc., 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Watchtower Bible & Tract Soc. v. Los Angeles County, 9 Cir., 181 F.2d 739 (1950); N. A. A. C. P. v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

The motion to dismiss, based on the assertion that plaintiffs are without standing to challenge the constitutionality of the Act, must be denied.

Defendants' supplemental motion to dismiss is based on the proposition that this Federal Court should abstain from taking jurisdiction because such action would interfere with the State of Tennessee in the administration of its criminal laws. In support of the motion many cases are cited.

One of the leading cases favoring abstention is that of Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S. Ct. 152, 89 L.Ed. 101 (1944). This case consumed nine years of litigation in five different courts before it was finally determined on the merits. The suit questioned the validity of state taxes which involved questions of local law and when decided by state courts might eliminate federal constitutional questions. The case was remanded by the Supreme Court to the district court with directions to retain the suit pending the determination of proceedings to be brought in the state court within a reasonable time.

Another case cited is that of Harrison, Attorney General v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152 (1959). In that case, five Virginia statutes were challenged, three of which were declared to be invalid under the Fourteenth Amendment. The other two were found to be vague and ambiguous and the Court retained jurisdiction pending a construction by the state courts. Chapters 31 and 32 were registration statutes. Chapter 31 dealt with the rendering of financial assistance in litigation. Chapter 32 dealt with activities relating to the passage of racial legislation and also with the raising and expenditure of funds in connection with racial litigation. Chapter 35 was a barratry statute and made it an offense for stirring up litigation. The lower court held Chapters 31, 32 and 35 unconstitutional. A majority of the Supreme Court held that the district court should have abstained from deciding the merits of the issues tendered it so as to afford the Virginia courts a reasonable opportunity to construe the three statutes. The basis of the holding was the avoidance of unlawful interference by federal courts with proper and validly administered state matters. Three of the justices, including the Chief Justice, dissented.

N. A. A. C. P. v. Button, supra, was a companion case to the Harrison v. N. A. A. C. P. case, supra, which involved the sole issue of constitutionality of Chapter 33 of the Virginia Acts of Assembly, Extra Sess. 1956, as applied to the activities of the N. A. A. C. P. The question was originally decided by the Richmond Circuit Court. The three-judge federal court originally abstained as to Chapter 33 and after the state courts of Virginia had held the statute to be constitutional, the Supreme Court ultimately determined that it was not constitutional and granted the relief that was orignally sought before the three-judge court.

City of Chicago v. Fieldcrest Dairies, Inc., 316 U.S. 168, 62 S.Ct. 986, 86 L.Ed. 1355, involved the validity of a milk ordinance passed by the City of Chicago which required that quantities of milk less than one gallon should be delivered in standard milk bottles. While the suit was pending in the district federal court, the milk company instituted an action in the Illinois State Court raising substantially the same issues and the same relief as sought by the respondent in the federal court. The Court held that the procedure that was followed in Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971, should be followed in this case as Illinois had the final say as to the meaning of the ordinance in question.

Martin v. Creasy, 360 U.S. 219, 79 S. Ct. 1034, 3 L.Ed.2d 1186, involved the Pennsylvania statute, 36 P.S. § 2391.8 which provides that the owners of property affected by the designation of a "limited access highway" shall be entitled "only to damages arising from an actual taking of property" and not for "consequential damages where no property is taken." Respondents owned property abutting a section of highway in Pennsylvania which was about to be designated as a limited access highway. They sued in the federal court for injunctive relief and for a judgment declaring the statute unconstitutional. The Supreme Court ruled that the district court should have stayed its hand because of the varying effects which the contemplated state action may have upon different landowners and the desirability of avoiding unseemly conflict between two sovereignties and the necessary impairment of state function.

Railroad Commission of Texas v. Pullman Co., 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) involved the propriety of a ruling by the Texas Railroad Commission, in sections of Texas where passenger traffic was light, that no sleeping car should be operated on any line of railroad in the State of Texas unless cars were continuously in the charge of an employee having the rank and position of Pullman conductor. The Pullman Company and the railroads affected instituted an action in the federal district court to enjoin the Commission's order since, where trains carried only one sleeper, a porter had been used. A three-judge court enjoined the order. An appeal was taken to the Supreme Court. The Supreme Court, in an opinion written by the late Mr. Justice Frankfurter, who was long an advocate of the abstention doctrine, held that the district court should have abstained. The Court observed that the use of Pullman porters tendered a substantial constitutional issue which touched a sensitive area of social policy upon which the federal courts ought not to enter unless there was no alternative for adjudication; that such constitutional adjudication could be avoided if a definitive ruling on the state issue would terminate the controversy.

Louisiana Power & Light Company v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058, involved an interpretation of a condemnation statute of the State of Louisiana. A majority of the court, in an opinion written by Mr. Justice Frankfurter, sustained the abstention order entered by the district judge on his own motion awaiting an interpretation of the statute by the Louisiana Supreme Court. Two justices, including the Chief Justice, dissented.

The foregoing cases show that the Supreme Court has applied the abstention doctrine in certain cases involving eco-

nomic and business matters, and in the cases of Railroad Commission of Texas v. Pullman, supra, and N. A. A. C. P. v. Button, supra, which involved civil rights.

Under the latest views expressed by the Supreme Court in the case of Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22, abstention should not be invoked in the present case. In that case, appellants, a civil rights organization and its executive director, brought in the federal district court, a suit in which other individuals joined, to restrain appellees from prosecuting or threatening to prosecute them under the Louisiana's Subversive Activities Law which they alleged violated the First and Fourteenth Amendments. Appellants contended that the statutes were too broad and were being used by appellees in bad faith, not to secure valid conviction, but to deter appellants' civil rights efforts. Appellants charged arrests and continued threats of prosecution after invalidation by a state court of the arrests and seizure of evidence preceding the federal action. A three-judge district court dismissed the complaint for failure to state a claim upon which relief could be granted and held that abstention was appropriate pending a possible narrowing construction by the state courts which would avoid unnecessary adjudication. The Supreme Court held that the district court erred in holding that the complaint failed to allege sufficient irreparable injury to justify equitable relief and also erred in holding that it should abstain pending interpretation of the statutes in the state court. The Court noted that the appellants had challenged the statutes as overly broad and vague regulations of expression. The Court said:

"* * * In such cases, abstention is at war with the purposes of the vagueness doctrine, which demands appropriate federal relief regardless of the prospects for expeditious determination of state criminal prosecutions. Although we hold today that appellants' allegations of threats to prosecute, if upheld, dictate appropriate equitable relief without awaiting declaratory judgments in the state courts, the settled rule of our cases is that district courts retain power to modify injunctions in light of changed circumstances. (Citing cases)" p. 492, 85 S.Ct. p. 1124.

See: Harman v. Forssenius, 380 U.S. 528, 85 S.Ct. 1177, 14 L.Ed.2d 50; Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714.

Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377, involved a class action brought by members of the faculty and students of the University of Washington for a judgment declaring unconstitutional 1931 and 1955 state statutes requiring the taking of oaths as a condition of employment. The 1931 oath required teachers to swear to promote respect for the flag and the institutions of the United States and the State of Washington, reverence for law and order and undivided allegiance to the Government of the United States. The 1955 oath for state employees incorporated provisions of the state Subversive Activities Act, and required the employee to swear that he is not a subversive person; that he did not teach or advocate the overthrow of the constitutional form of government by revolution, force or violence. A three-judge district court held that the 1955 statute and oath were not unduly vague and did not violate the First and Fourteenth Amendments and abstained from ruling on the 1931 oath until it was considered by the state court. The Supreme Court reversed by holding that the oaths were too vague, uncertain and broad, and violated due process of law. The Court observed that federal courts do not automatically abstain when faced with a doubtful state law; that construction of the 1931 oath could not eliminate vagueness from its terms and would probably raise other constitutional issues; and, that abstention leads to piecemeal adjudication and protracted delays.

We conclude that in the peculiar circumstances in this case irreparable harm would have been done by awaiting

a criminal test in the state courts; and that in addition, the statute had a doubtful meaning. The facts in this case do not require abstention. The supplemental motion to dismiss must be denied.

Defendants assert in their answer that the Act meets constitutional requirements. They assert that the ultimate issue in the case is whether the Tennessee General Assembly may require members of the opposite sex to wear clothing in the presence of each other, except where they are joined as man and wife.

We are cited to only a few cases in other states interpreting statutes prohibiting nudism. There are none in Tennessee, except those which deal with indecent exposure or lewdness which were common law crimes. The indecent exposure or lewdness must occur in a public place in order for it to be a criminal offense. Abbott v. State, 163 Tenn. 384, 43 S.W.2d 211 (1931); Ryall v. State, 204 Tenn. 422, 321 S.W.2d 809 (1958). A number of modern statutes have retained the common law requirement that the act must be committed in public. 94 A.L.R.2d 1382, et seq.

The statute, Pub.Acts 1931, No. 328, before the Court in People v. Ring, 267 Mich. 657, 255 N.W. 373, 93 A.L.R. 993 (1934), reads in pertinent part:

> "Any man or woman, not being married to each other, who shall lewdly and lasciviously associate and cohabit together, and any man or woman, married or unmarried, who shall be guilty of open and gross lewdness and lascivious behavior, or who shall designedly make any open or indecent or obscene exposure of his or her person, or of the person of another, shall be guilty of a misdemeanor * * *."

Defendant operated a nudist colony in Allegan county in a more or less secluded spot in the country, consisting of tents and a building 8 x 10 feet in size, partially boarded up, all surrounded by a second growth of scrub oak in a clearing of about three acres. It was located about a mile and a half from the highway and was reached by a road claimed to be private. The court held that it was clearly shown that defendant and others designedly made an open exposure of their persons in a manner that was offensive to the people of the State of Michigan and upheld the verdict of guilty.

People v. Hildabridle, 353 Mich. 562, 92 N.W.2d 6, another Michigan case, defendants were convicted under a statute, Comp.Laws Supp. 1956, § 750, 335a, providing in part: "Any person who shall knowingly make any open or indecent exposure of his or her person or of the person of another shall be guilty of a misdemeanor * * *." When the police arrived, the defendants were sitting or standing in groups near a pond. There was no evidence of immorality. They were entirely unclothed. Three of the judges held that the defendants were not guilty as a matter of law. Justice Voelker expressly disapproved the opinion in the *Ring* case, supra. Justice Dethmers wrote an opinion affirming the guilty verdict on the merits, in which two other justices joined. Justice Edwards (now a Circuit Judge of the Sixth Circuit) concurred in the opinion of Justice Voelker, but only on the point of an illegal search and seizure.

In People of New York v. Burke, et al., 267 N.Y. 571, 196 N.E. 585 (1935) defendants were convicted of violating Section 43 of the Penal Law, Consol.Laws, c. 40 (openly outraging public decency) and section 1140 (indecent exposure). The Appellate Division reversed the conviction and the Court of Appeals affirmed the reversal. Defendants charged fees for admittance to a gymnasium where men and women appeared naked. The Court of Appeals held that the practice of nudism in a gymnasium open to the public for a fee did not fall within the terms of the statute which required willful and lewd exposure of the person. There were two dissents.

In the case of Excelsior Pictures Corp. v. Regents of University, 3 N.Y.2d 237, 165 N.Y.S.2d 42, 144 N.E.2d 31, the Court had under review the denial to petitioners by the Regents of a license

to exhibit in New York State a motion picture called "Garden of Eden." The film fictionalized depiction of a nudist group in a secluded private camp in Florida. The Board based its action on Section 1140–b of the Penal Law passed in 1935 which provided in part:

"A person who in any place wilfully exposes his private parts in the presence of two or more persons of the opposite sex whose private parts are similarly exposed, or who aids or abets any such act, or who procures another so to expose his private parts or who as owner, manager, lessee, director, promoter or agent, or in any other capacity, hires, leases or permits the land, building or premises of which he is the owner, lessee or tenant, or over which he has control, to be used for any such purposes, is guilty of a misdemeanor."

The Court observed that 1140–b was passed because of the *Burke* decision, which involved "professional exploitation" and "exhibitionism for financial gain." The Court held that the Board of Regents, because of a mistaken belief that Section 1140–b required a denial of a license to exhibit the picture, went beyond the permissible limits of censorship. The Court observed:

"* * * Of course, the law is very broadly drawn but our duty is to give it a reasonable and sensible meaning in the light of the evil at which it was directed. Because it is a restraint of liberty and because it creates a crime unknown to the common law (as to the common law of nudity in nonpublic places see 67 C.J.S. Obscenity §§ 5, 6) it should be narrowly and strictly construed. Literal meaning would penalize not only innocent and orderly nudism but would make it a misdemeanor for a parent and members of a family to be unclad in their family home. No rational Legislature ever intended to create such a crime. The law should be interpreted sanely as penalizing nudity in public or quasi-public places only."

(165 N.Y.S.2d 42, 48, 144 N.E.2d 31, 36.)

In the case of State, ex rel. Church et al. v. Brown, Secretary of State, 165 Ohio State 31, 133 N.E.2d 333, a corporate charter was sought by a nudist group which was refused by the Secretary of State on the ground that Section 2905.31 of the Revised Code of Ohio prohibited the practice of nudism. The Court stated that the enactment of the section was a valid exercise of the police power, but did not discuss either nudism or the statute.

The most recent case involving nudism is State of Florida ex rel. Cottrill v. Bessenger, Fla., 133 So.2d 409 (1961). The decision in that case did not turn on the practice of nudism itself but on the fact that the law is based on an unreasonable classification and was not, therefore, enacted in compliance with the Florida constitution. A similar case is Ex parte Porter, 141 Fla. 711, 193 So. 750. The decision in the earlier Florida case of *Ex parte Porter,* supra, was also based on an unreasonable classification.

We are told in plaintiffs' brief that the State of Arkansas is the only other state that has a specific statute prohibiting nudism. This statute was enacted in 1957 and is known as Act 38, Senate Bill 95. This Act has not been challenged.

The Act in question makes it a violation for any person or corporation to operate a nudist colony or to engage in nudist practices. No legislative purpose is stated in the Act nor is reason stated for banning nudist practices or nudist colonies, or what the Legislature had in mind in its passage.

Neither the term "nudist colony" nor "nudist practices" is defined in the Act or in its legislative history. The deliberations of the Legislature that resulted in the passage of the Act were electrically recorded and have been transcribed to typewriting and filed as Exhibit 3 to the complaint.

Webster's New Collegiate Dictionary defines the word "nude" as "bare; de-

void of covering; naked; unclothed." "Nudity" is defined as "quality, state, or fact of being nude; nakedness. That which is naked." "Nudism" is defined as "the cult or practice of living in a nude state."

Webster's Third New International Dictionary (Unabridged) (Merriam-Webster) defines "nudism" as "the cult or practice of living unclothed for reasons of health." "Nudist" is defined as "an advocate or practitioner of nudism."

Webster's New Twentieth Century Dictionary, Second Edition, (Unabridged), published in 1964 by the World Publishing Company defines "nudism" on page 1227 as "the practice or cult of nude for hygienic reasons." Webster's New International Dictionary, Second Edition, (Unabridged), published in 1961 by G & C Merriam Company, defines "nudism" on page 162 as "the cult or practice of living in a nude state."

We are not told, either in the Act or in its legislative history, the character of the nudity that is indecent. The type of conduct of the nudist which is prohibited is not mentioned in the Act. The Act does not say whether it is limited to exposures in the presence of the opposite sex. Neither indecency nor immoral conduct is mentioned. It cannot be determined from the wording of the Act whether it applies to public or quasi-public places.

The complaint charges that the Timberline Club is in a remote section of Knox County and that it can only be reached over a private road, which is surrounded by thickets, brush and undergrowth.

The words in the Act, if literally construed, would prevent nudism in health clubs, YMCA's school gymnasiums or other recreational systems, and possibly in the home. The number that it takes to constitute a nudist colony is not stated.

Defendants say that the statute was passed under the police power of the state which is an attribute of sovereignty and that the words in it should be given their natural and ordinary meaning.

But it cannot be said with certainty whether persons of one sex taking sun baths in the nude in isolated places is prohibited. The question of whether man and wife can take a sun bath in the nude in an enclosure hidden from the public without violating the Act is in doubt. Restriction on nudist practices and the operation of nudist colonies as to time and place is unlimited.

A statute that contains a criminal sanction that is so unclear and indefinite as to make it uncertain in meaning does not meet the due process test contained in the Fourteenth Amendment to the Federal Constitution.

Criminal statutes must be framed so that those to whom they apply may know what standard of conduct is intended to be required. Cline v. Frink Dairy Company, 274 U.S. 445, 458, 47 S.Ct. 681, 71 L.Ed. 1145.

The spirit and purpose of the statute and the objectives sought by the Legislature must be borne in mind. Excelsior Pictures Corp. v. Regents of University, supra.

In Connally v. General Construction Company, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926), the Court had before it for interpretation Oklahoma Comp. Statutes 1921, §§ 7255, 7257 imposing cumulative punishments upon contractors with the State who paid their workmen less than the current rate of per diem wages in the locality where the work was performed. In holding the statute void for uncertainty, the Court observed at page 391, 46 S.Ct. at page 127:

"That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its appli-

cation violated the first essential of due process of law. International Harvester Co. of America v. Com. of Kentucky, 234 U.S. 216, 221 [34 S.Ct. 853, 58 L.Ed. 1284]; Collins v. Com. of Kentucky, 234 U.S. 634, 638 [34 S.Ct. 924, 58 L.Ed. 1510]."

In Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888, an act of New Jersey, R.S. 2:136-4 was considered which declared that: "Any person not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or any other State, is declared to be a gangster * * *".

Considerable difficulty was experienced by the Court in determining the meaning of the word "gang," and it held that the statute did not meet the test of the due process clause of the Fourteenth Amendment because of its vagueness and uncertainty. It said:

"The lack of certainty of the challenged provision is not limited to the word 'gang' or to its dependent 'gangster'. Without resolving the serious doubts arising from the generality of the language, we assume that the clause 'any person not engaged in any lawful occupation' is sufficient to identify a class to which must belong all capable of becoming gangsters within the terms of the provision. The enactment employs the expression, 'known to be a member'. It is ambiguous. There immediately arises the doubt whether actual or putative association is meant. If actual membership is required, that status must be established as a fact, and the word 'known' would be without significance. If reputed membership is enough, there is uncertainty whether that reputation must be general or extend only to some persons. And the statute fails to indicate what constitutes membership or how one may join a 'gang'". p. 458, 59 S.Ct. p. 621.

The foregoing language has application to the statute under consideration, in that it fails to indicate what constitutes a nudist colony and the necessary acts to engage in nudist practices. United States v. L. Cohen Grocery Company, 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516.

In Winters v. People of State of New York, 333 U.S. 507, 515, 68 S.Ct. 665, 670, 92 L.Ed. 840, the Supreme Court ruled that the standards of certainty with respect to statutes containing criminal sanctions are more exacting than those containing only civil sanctions.

" * * * The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcment. The crime 'must be defined with appropriate definiteness.' Pierce v. United States, 314 U.S. 306, 311 [32 S.Ct. 237, 239, 86 L.Ed. 226]. Cantwell v. [State of] Connecticut, 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352]. There must be ascertainable standards of guilt. Men of common intelligence cannot be required to guess at the meaning of the enactment. * * * "

The testimony of Sheriff Weaver, Senator Berry and Representative Morton points up the uncertainty of the Act and the difficulties involved in its enforcement. Sheriff Weaver did not know whether it was a nudist practice to swim nude at the YMCA or to be nude in one's home. He did not consider sun baths to be nudist practices. His feeling was that there is a vagueness about nudist practices that requires definition.

The Fourteenth Amendment requires that:

" * * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

■ We are of the opinion that the Act is too vague and indefinite to comply with the due process of law provision of this Amendment and that it must, therefore, be held unconstitutional for lack of "appropriate definiteness."

Other contentions made by the plaintiffs, some of which raise serious questions, have been considered, but in view of the decision reached, consideration of them is not deemed necessary.

Injunctive relief is not deemed necessary at this time because it is believed that the Governor, the Attorney General and the Sheriff of Knox County, as well as other law-enforcement officers of the State, will abide by the declaration of this Court that the statute is invalid, unless and until overturned by a higher court.

DARR, Senior District Judge (concurring).

I fully agree with my colleagues in denying the motions to dismiss which were (1) that the plaintiffs had no standing to prosecute this case and (2) that the doctrine of abstention should be applied.

With due deference, I find myself unable to otherwise concur with the action of my two colleagues in their judgment that the Tennessee Public Act, Chapter 176, is unconstitutional for the reason that its meaning is so vague as to controvert the minimal standards of due process under the Fourteenth Amendment of the Federal Constitution.

There can be no doubt that all criminal statutes must have an ascertainable standard of guilt, Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146; Williams v. United States, 341 U. S. 97, 71 S.Ct. 576, 95 L.Ed. 774, whereby: (a) A citizen may reasonably inform himself as to the law and thus avoid his violation; (b) officers making arrests for alleged violations of the law will not be required to simply guess in ascertaining the guilty from the innocent; (c) and finally the courts have reasonable guidelines in effectuating the intent of the legislation.

In regard to these criteria the United States Supreme Court has had occasion to state that the terms of the statute must be sufficiently explicit to inform those who are subject to it as to what conduct on their part will render them liable to its penalties and to guide the courts trying those who are accused. United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516, 14 A.L.R. 1045; Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; Boyce Motor Lines v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367; Musser v. State of Utah, 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562. Other cases state the principle of construction in a somewhat different manner. A state statute which either forbids or requires a doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential elements of due process. Connally v. General Constr. Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877; Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840.

On the other hand, it must be borne in mind that only reasonable degree of certainty can be demanded. In Boyce Motor Lines v. United States, supra, the Court said:

But few words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions.

In concluding whether a particular statute measures up to the constitutional standards of clearness, two basic statutory constructions must be observed: (1) All duly enacted statutes must, if possible, be construed procedurally as well as substantially in favor of their constitutionality. 16 C.J.S. Constitution § 98. Also see: South Utah Mines & Smelters v. Beaver County, Utah, 262

U.S. 325, 43 S.Ct. 577, 67 L.Ed. 1004; St. Louis Southwestern Ry. Co. v. State of Arkansas ex rel. Norwood, Ark., 235 U.S. 350, 35 S.Ct. 99, 59 L.Ed. 265; Karpark Corp. v. Town of Graham, D.C. N.C., 99 F.Supp. 124, affirmed C.A.4, 194 F.2d 616.

(2) In regard to procedure as well as substance all duly enacted statutes, of their very nature, bear an extremely strong presumption of constitutionality. 16 C.J.S. Constitutional Law § 99:

> Likewise, any ambiguity in a statute must be resolved in favor of its constitutionality. Further, a statute or resolution will be upheld by the courts unless it clearly appears, or is shown to be, in violation of or prohibited by the constitution. Other holdings are that such violation or prohibition must be shown, or appear, conclusively, plainly, or palpably, or as stated by the courts in other cases, unmistakably, manifestly, positively, indisputably, definitely, completely, inevitably, convincingly, unquestionably, undoubtedly, obviously, patently, substantially, or beyond a, any, or all reasonable doubt, or, in the language of other decisions, beyond a, any, or all rational, substantial, or serious doubt, or beyond question, or in such a manner as to leave no hesitation in the mind of the court. [The number of pages occupied in CJS by this relatively short quotation concerning constitutional statutory construction is indicative of the staggering number of footnote cases supporting the long list of adjectives herein used.]

Bringing these general provisions of statutory construction into present focus it becomes incumbent to apply these guidelines to Tennessee Public Act, Chapter 176. As pointed out in the majority opinion, this state statute makes it an offense (1) to operate a nudist colony and (2) makes it an offense for any person to engage in nudist practices.

I think the differences between my colleagues and myself arise from the meaning and scope of the words "nudist" and "nudism". The first and most logical place to check the accuracy of one's understanding in regard to these terms is a good dictionary. The majority opinion has given definitions from several dictionaries. I utilized one of the dictionaries therein used and give definitions of related words, particularly the words "nude" and "nudity" to illustrate the point that they are basically different in meaning from the words "nudist" and "nudism".

Colony "* * * n * * * A group of persons united by a common characteristic or interest living in a limited section surrounded by others not so united * * * (also) the section or quarter occupied by such a group * * *"

Nudism "* * * N * * * The cult or practice of living unclothed for reasons of health." (Only definition given)

1 Nudist "* * * N * * * An advocate or practitioner of nudism." (Only definition given)

2 "* * * adj: of or relating to nudists or nudism."

Nudity "* * * n * * * 1: the quality or state of being nude 2: a nude figure, esp. as depicted in art. (Only definition given)

1 Nude "* * * adj * * * Devoid of clothing; UNCLOTHED b: UNDRAPED"

2 Nude "* * * n * * * an unclothed person 2: the condition of being unclothed or undraped."

Webster's Third New International Dictionary (Unabridged) G & C Merriam Co., Springfield, Mass. (1961)

It seems to me that a cursory glance at these definitions bears out what the average "man-on-the-street" knows,

namely, that one who is temporarily nude or in a temporary state of nudity in no way implies that such person is a nudist or engaged in nudist practices. It is inconceivable to me that the board of directors of a YMCA or health club or like places, which permit nude swimming, sun bathing, or exercising, are the operators of nudist colonies. To me it is very far out to think that the head of a house would be operating a nudist colony because members of his family are temporarily nude within the home. It is equally inconceivable that the persons who are temporarily in the nude for the purposes just above-mentioned could possibly be nudist practitioners. People who are nudists, that is, members of nudist colonies, live naked as against the type people who are together and temporarily unclothed for the purpose of recreation or otherwise. Also nudists are members of a sect or cult. I have never heard of nude swimmers at the YMCA, or like practitioners, being called members of a sect or cult, and I have never heard of a manager of a YMCA, or a father in the home, being considered the operator of a cult or sect that believed in living without clothes. As far as I am concerned, I am of the firm belief that in this day people fully understand what a nudist colony is and what a nudist practitioner is. A nudist colony, I think, is generally understood to be a group of people of both sexes who seclude themselves from the public eye and live together without any clothes and that any person who engages in nudist practices is a member of such nudist colony.

The distinction between nudity and nudism is borne out historically as well as grammatically, for this cult found its genesis in the German nackt kultur ("naked culture") groups in the early part of the twentieth century. Prior to World War I they were distinguishable not only by their lack of clothes but by their strong nationalistic tendencies as well. In the period between the two wars, however, this latter distinction faded away. Following the German example many societies were formed in England, France, Scandivania, and a few other European countries. During the 1930's similar cults or societies took root in this country and Canada. Their growth, however, was stunted by the Second World War. It is historically characteristic of these groups that they not only do not attempt to force others to espouse their beliefs but prefer to practice nudism in a secluded area as far away as possible from the strictures of society. Encyclopedia Britannica, Inc. U.S.A. (1962), vol. 16, pages 594 and 594a. In Germany, as elsewhere, nudists still hold to their historical beliefs and practices. In this country of their origin, the "Association for Free Body Culture" has increased in membership from 1000 in 1949 to over 50,000 today. Indicative of their innocuous character, the Government of West Germany has officially sanctioned 80 nudist beaches.[1]

The majority say that the statute does not set out whether the practices therein forbidden are to be in public or quasi-public places. The members of the legislature that enacted the statute, as well as all concerned, or not concerned for that matter, know that there is in Tennessee a law against indecent exposure. The legislature would not be passing a law to reach people who live naked in public places when the law already covered such behavior.

It might be here pointed out that apparently there is only one law similar to the law attacked and that is in Arkansas, which has not been tested. Several cases cited in the majority opinion on this question are all based upon statutes of various wordings prohibiting indecent exposure and lewdness.

For the reasons I have set forth above, I cannot agree with my two brother judges that the Tennessee Public Act, Chapter 176, falls short of the constitutional minimum for statutory "terminological exactitude". It is my belief that the con-

1. "Time Magazine, 80; 25, S 7, 62."

stitutional requirement of *procedural* due process is suitably met by the statute.

The nature of *substantive* due process is, however, another problem entirely. In this regard I have strong misgivings concerning the Tennessee Nudism Statute and question whether, regardless of the propriety of its grammatical construction, it does not unjustifiably deny liberty by improper encroachment upon the right of privacy and freedom of association.

In determining the constitutionality of the substantive aspects of the statute before this court it seems to me that it is necessary to come to grips with two integral and interrelated liberties.

1. Does this statute transgress the minimal standards of substantive due process by an unwarranted invasion upon the right of privacy of those who wish to engage in the cult of nudism?

None who make it a point to keep current with United States Supreme Court rulings, particularly recent ones, could have any doubt that the right of privacy is now constitutionally protected. That Court has wisely recognized that the Constitution creates a "right of privacy, no less important than any other right carefully and particularly reserved to the people." Griswold et al. v. State of Conn., 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, citing Mapp v. State of Ohio, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081. As I have stated, it is apparent *that* the right of privacy is constitutionally protected. It is the *when* and *how* which create the problems.

Invasion of privacy, an action unknown to early common law, was first recognized as a tort. Much credit for this recognition must be given to the now famous 1890 article by Warren and Brandeis in 4 Harv L Rev 193. This right was first given nodding recognition as a constitutional issue in several dissents by Justice Brandeis. Subsequently it received a somewhat less grudgingly, though certainly limited, acceptance in cases concerning searches and seizures and restraints on speech, press and assembly. [For partial summary of the evolution of this right see Gibson v. Florida Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929, (concurring opinion by Justice Black, footnote 7)]. In these cases right of privacy was conceived of as a concomitance of other rights specifically granted by the Constitution. From this timorous genesis the right of privacy seems to have emerged by way of Mapp v. State of Ohio, supra, and Griswold, et al. v. State of Conn., supra, from a purely peripherial concept primarily used to buttress other more fundamental rights, to the view that "the right of privacy is a fundamental personal right, emanating 'from the totality of the constitutional scheme under which we live.'" Poe v. Ullman, 367 U.S. 497, 502, 81 S.Ct. 1752, 6 L.Ed.2d 989, dissenting opinion of Justice Douglas cited with approval in Griswold, et al. v. State of Conn., supra, concurring opinion of Justice Goldberg. Also see 16A C.J.S. Constitutional Law § 574, page 606, Right of privacy.

Even a cursory scanning of *Griswold*, supra, would immediately convince the reader that there is a substantial agreement among the justices, with the exception of Justice Black and Justice Stewart, that to a reasonable extent the right of privacy is constitutionally protected. But on the other hand, even the most cautious and meticulous reader would be unable to pinpoint which provision of the Constitution secures this right, for the majority of the Court appears to disagree concerning this point. However, I am convinced that the operators of nudist colonies and persons engaged in nudist practices are constitutionally entitled to the right of privacy, which is a liberty protected by the Due Process Clause of the Fourteenth Amendment rendering this state statute invalid.

2. Does this statute similarly violate the cult of nudism's right of association?

In Gibson v. Florida Investigation Committee, supra, the Court has stated:

This Court has repeatedly held that rights of association are within the

ambit of the constitutional protections afforded by the First and Fourteenth Amendments. N. A. A. C. P. v. State of Alabama, 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488]; Bates v. City of Little Rock, 361 U.S. 516 [80 S.Ct. 412, 4 L.Ed.2d 480]; Shelton v. Tucker, 364 U.S. 479 [81 S.Ct. 247, 5 L.Ed. 2d 231], N. A. A. C. P. v. Button, 371 U.S. 415 [83 S.Ct. 328, 9 L.Ed.2d 405]. The respondent Committee does not contend otherwise, nor could it, for, as was said in N. A. A. C. P. v. [State of] Alabama (US) supra, "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the "liberty" assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech. 357 U.S. at 460, [78 S.Ct., at 1171]. And it is equally clear that the guarantee encompasses protection of privacy of association in organizations such as that of which the petitioner is president; * * *

* * * * * *

And, as declared in N. A. A. C. P. v. [State] Alabama, supra, (357 U.S. at 462 [78 S.Ct., at 1171]) "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] * * * effective * * * restraint on freedom of association * * *. This Court has recognized the vital relationship between freedom to associate and privacy in one's associations. * * * Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." So it is here.

In NAACP v. State of Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488, 1498, 1500, the Supreme Court ruled that NAACP did not have to disclose the names of its members by reason of a state mandate. This right awarded to NAACP was from performing an action in connection with their constitutionally protected right of association.

The Supreme Court ruled in NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L. Ed.2d 405, 420 that, " * * * there is no longer any doubt that the First and Fourteenth Amendments protect certain forms of orderly group activity." Thus the First Amendment giving the absolute right of freedom of association (assembly) includes freedom of action in connection therewith. It is quite clear that nudists have the constitutional freedom to engage in association for the advancement of beliefs and ideas. Attached to this freedom of association is also the freedom of action which utilizes the beliefs and ideas for the assemblies, if such action is compatible with the freedom of others.

As heretofore pointed out the State of Tennessee has a law against indecent exposure and lewdness. Ryall v. State, 204 Tenn. 422, 321 S.W.2d 809. Certainly the State has a right under its police power to protect the public from lewd conduct and indecent exposure. Of course, these proscribed acts must be done in a public place which would cause offense to members of the public.

Thus the matter here for decision is not whether the state can prohibit public nudity, but whether it can prohibit the private, secluded, unobtrusive practice of nudism, without a clear showing that such nudism improperly encroaches upon some other legally protected right.

In order to constitutionally prohibit group association for private action there must be established a strong present public need for such prohibition. Griswold v. State of Conn., supra. In other words, to invalidate the Tennessee Nudist statute there must appear a cause "which is sufficient to justify the deterrent effect . . . [upon] the free exercise by the petitioner's members of their constitutional rights of association." See American Communications Ass'n v. Douds, 339 U.S. 382, 445, 70 S.Ct. 674, 94 L.Ed. 925; Schneider v. State of New Jersey, 308 U.S. 147, 161, 164, 60 S.Ct. 146, 84 L.Ed. 155. "Such a '. . . sub-

ordinating interest of the State must be compelling.' Sweezy v. State of New Hampshire, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311, 1332 (concurring opinion)."

There is nothing in the record to indicate directly or by inference that any nudist colony or member thereof is the source of any injury whatever to the public welfare, health or morals. To the contrary, the proof in the record asserts that the prime purpose of the nudist movement is to promote health of the body and mind. It would appear that almost all nudist groups base their very cause of existence entirely upon hygienic purposes. A statement of the basic rationale of nudism may be found in vol. 16, pages 594–594A, Encyclopedia Britannica, Wm. Benton Pub., 1962.

There is nothing in the proof whatever to indicate that nudism is other than an idiosyncratic, though innocous, practice which engenders no harm or danger either to its members or society in general. In view of the fact that it lies uncontroverted in the record that the aim of nudists and nudist colonies is simply to indulge in amicable association with the purpose in view to promote physical and mental health, I can come to no other conclusion but that nudists have a constitutional right to practice their beliefs in the manner heretofore indicated.

It is my thought that the Tennessee Nudism statute prohibits the practice of nudism in clear and understandable language. However, I conclude that the freedom of association and the right of privacy are each constitutional rights, which, for the purposes of this investigation, are absorbed by the Fourteenth Amendment.

Applying these principles to the validity of the Tennessee Public Act, Chapter 176 (Section 39–3009 TCA), result in the conclusion that this legislation is unconstitutional as violating substantive due process.

Moreover, if it should be that all the Justices of the Supreme Court are not in agreement upon the proposition that the right of privacy is constitutionally protected then it would seem that this principle of law would apply: Certainly the right of privacy is a well established fundamental right of individuals or groups which cannot be disturbed by the Federal or state government by reason of the provisions of the Ninth Amendment specifically reserving such rights to the people. Justice Goldberg for himself, the Chief Justice and Justice Brennan in Griswold, et al. v. State of Conn., supra.

While I believe that what has been said is sufficient to establish that this state statute is unconstitutional, I am inclined to think that this statute works a discrimination against nudist colonies and their members under "the equal protection of the laws" provision of the Fourteenth Amendment, as it would seem that the nudist cults would be protected in the right to assemble and follow their practices in the manner they do, as other organizations do, such as NAACP.

Therefore, I concur in the results reached in the majority opinion.

## ADDENDUM

"Lest I be heralded as the patron saint of nudism" (see vol. 51, No. 6, ABA Journal, page 564), let me add this hasty remark: The wiles and lures of that most peculiar cult completely elude me. It seems in fact something of a mystery why those who engage in its strange practices are willing to suffer both the stings of outraged public opinion and voracious, ravenous insects in order to pursue its illusory rewards. To my personal way of thinking the theories of nudism are not only foolish but down right distasteful and indelicate. But as such theories play no legitimate part in a judicial opinion, I shall call all personal remarks short, simply stating that in our triune form of government it is the particular duty of the judiciary to protect individuals and minorities in their constitutional rights even though their beliefs and activities may be heretical or unpopular.