OPINION OF THE COURT
Gerard M. Weisberg, J.
This claim seeks payment for work performed by Deverho Construction Company, Inc. (Deverho), under a contract with the State of New York (State), which provided for the reconstruction of a portion of the Newburgh-Campbell Hall State Highway. The contract was let on April 25, 1974, and was awarded to claimant on April 30, 1974. Pursuant to section 112 of the State Finance Law, the Comptroller’s approval was obtained on June 14, 1974.
Claimant’s first cause of action concerns item 619.01 of the contract entitled Basic Maintenance and Protection of Traffic, and relates to two distinct time periods, one at the beginning and one at the end of the contract’s duration.[1] Basic Maintenance and Protection of Traffic is defined by the Standard Specifications of 1973 under paragraph 619-102 as follows: " '[t]raffic shall be maintained over a reasonably smooth traveled way which shall be so marked by signs, delineators, guiding devices and other methods that a person who has no knowledge of conditions may safely and with a minimum of discomfort and inconvenience ride, drive or walk, day or *1056 night, over all or any portion of the highway under construction where traffic is to be maintained.’ ”
" '[M]aintain the drainage facilities and other highway elements, old or new, including detours’ ”. Also pertaining to this item, the following appears on page 26 of the contract documents under "Maintenance of Traffic”:
"The Contractor shall be required to maintain and protect two-way traffic and protect the public from damage to person and property, within the limits of and for the duration of the contract in accordance with all specifications for Basic Maintenance and Protection of Traffic, Item 619.01.”
"In order to maintain effective traffic control, the Contractor shall be responsible for continuous maintenance to make sure all signs, cones, flashing lights, etc. are in place and in good condition and that the traveled way is in a safe and reasonable condition. The Engineer will be the sole judge of the effectiveness of the Contractor’s efforts towards protection of traffic and personnel.”
"The Contractor shall maintain and protect traffic by so conducting his work operations that the public is subjected to a minimum of delay and hazard.”
The nature of this item was characterized by Nathaniel Gartman, a part owner and one of the managers of Deverho on this contract, as "payment for exposure”, representing the cost of procuring insurance for the protection of the public and to offset any potential liability, as well as for providing flagmen and other services as the need arose. Payment for Basic Maintenance and Protection of Traffic was on a per calendar day basis at the rate of $130 per day for the duration of the contract.
The dispute over this item concerns two periods — one from May 21 to June 19 and the other from October 16 to December 20 (1974). In regard to the former, claimant contends that payment is owed for Basic Maintenance and Protection of Traffic starting on May 21, by virtue of the contractor’s having performed work at the site on that date, pursuant to a request by the State. The facts are that on May 14 a preconstruction meeting was held at which a plan for performing the work was discussed. Subsequently, Mr. Gartman was instructed to provide certain assistance to the State’s surveyors. Deverho was informed by Mr. Lawrence Porvaznik, the State’s engineer-in-charge, that it was obligated to do so under the *1057 contract.[2] These instructions were given at a time when the contract had not yet been approved by the Comptroller. On May 21, the State surveyors commenced their work and claimant supplied the necessary assistance. Claimant had men on the job on May 21, 22, 23, 24 and 28 and June 12, 13 and 14, whose duties consisted of clearing brush, marking and removing trees and laying out stakes. Nothing of a positive nature was done by way of Basic Maintenance and Protection of Traffic on those dates, since the work was not near the highway. During this period, claimant was aware that if the Comptroller’s approval were not obtained, no payment for work performed would be forthcoming. Subsequently, however, on June 17, 1974, Deverho was notified that the contract had been approved by the Comptroller, and on June 19, it resumed work at the site.
The State contends that the contract officially began on June 19 and that claimant is not entitled to any payment for Basic Maintenance and Protection of Traffic prior to that date, even though some work was admittedly performed prior thereto. The basis for its contention is subdivision 2 of section 112 of the State Finance Law, which provides in relevant part as follows: “Before any contract made for or by any state department, board, officer, commission, or institution, shall be executed or become effective, when such contract exceeds one thousand dollars in amount * * * it shall first be approved by the comptroller and filed in his office.”
Claimant’s position is that the contract commenced when it first rendered performance (May 21). Claimant relies on the contract’s definition of “duration”, as set forth in the Standard Specifications of 1973 (p 394, par 619-1.10) as follows: "the duration of the Contract for the purpose of this work, shall be from the date any work is started on the Contract, including any preparatory work or moving in equipment, signs, offices, shops and the like, until the date the Contract is officially accepted.” (Emphasis added.)
The State maintains that the word "contract” in the definition of “duration” presupposes the existence of a valid, legally binding contract which, under subdivision 2 of section 112 of *1058 the State Finance Law, did not occur until June 14. Notwithstanding this position, the State did in fact pay claimant for a number of items of work which were also performed prior to June 14. The State seeks to. distinguish these items from Basic Maintenance and Protection of Traffic on the theory that they were bid on a "lump sum” basis as opposed to per calendar day. Of these lump sum items, the State says in its brief at page 7: "They are paid for when the contract becomes effective, regardless of when performed.”[3]
The State’s argument raises two issues: (1) whether a contractor has a legal right to be paid for work performed after a contract has been awarded, but prior to its approval by the Comptroller, and (2) whether in this case, the word "contract” in the definition of "duration” presupposes the prior approval of the Comptroller.
Within the scope of its application, subdivision 2 of section 112 of the State Finance Law constitutes a complete bar to any payment for work performed on the State’s behalf pursuant to an incipient contract which is never approved by the Comptroller. (Blatt Bowling & Billiard Corp. v State of New York, 14 AD2d 144; Starling Realty Corp. v State of New York, 286 NY 272; Belmar Contr. Co. v State of New York, 233 NY 189.) In the present case, however, the contract was approved by the Comptroller; the question is whether the statute’s application should be extended to bar payment for work performed on the contract prior to the time when approval takes place. In interpreting this provision of law, it is the court’s duty to "give it a reasonable and sensible meaning in the light of the evil at which it was directed.” (Matter of Excelsior Pictures Corp. v Regents of Univ. of State of N. Y., 3 NY2d 237, 245.) The purpose of subdivision 2 of section 112 of the State Finance Law is to prevent officers and agents of the State from creating liabilities for which there is no appropriation and to provide a check upon the making of improvident or extravagant contracts to the detriment of the State. (See 1915 Opns Atty Gen 28.) The public policy underlying the rule is sound and of great benefit to the State, although its application may have harsh consequences. It sometimes happens, for example, that a State agency solicits and accepts substantial benefits from a contractor in advance of the Comptroller’s approval. If the contract is subsequently *1059 rejected, the contractor may suffer substantial loss. In such a case, there is no recourse to the equitable remedies of quantum meruit and estoppel. (Blatt Bowling & Billiard Corp. v State of New York, supra.)
The result sought here by the State is equally harsh though hardly justified by any legitimate policy. The Comptroller’s approval was in fact obtained, indicating that funds were available to pay for the work and that the contract was not considered improvident. Hence, the policy underlying the statute was fully satisfied and effectuated. To construe the statute as constituting a bar to recovery in the instant case would extend its application far beyond its intended purpose. Moreover, it would result in a manifest injustice. As Judge Conway stated in Matter of Breen v New York Fire Dept. Pension Fund (299 NY 8, 19): "The general rule of statutory construction is that it is always presumed, with reference to a statute, that no unjust or unreasonable result was intended by the Legislature and the statute, unless the language forbids, must be given an interpretation and application consonant with that presumption. (Matter of Meyer, 209 N. Y. 386, 389; People v. Santoro 229 N. Y. 277, 281, 282; Archer v. Equitable Life Assur. Soc., 218 N. Y. 18, 25.)”
We hold therefore that once the Comptroller’s approval is obtained, subdivision 2 of section 112 of the State Finance Law has no further application. The rights and obligations of the parties are thereafter governed by the contract which they have made.
We observe further that the State’s payment for other work performed prior to June 14 (the so-called "lump sum” items), is inconsistent with its present interpretation of the statute. If subdivision 2 of section 112 of the State Finance Law bars payment for Basic Maintenance and Protection of Traffic, then it must similarly bar payment for all other work performed prior to the Comptroller’s approval. This contract was approved in its entirety; the statutory policy must be applied uniformly to every part thereof.
In the present case, however, the State seeks to revive the materiality of subdivision 2 of section 112 of the State Finance Law by proposing it as a rule of contract construction, the determinative provision of the contract being the definition of "duration”.[4] By way of clarification, the issue is whether the *1060 word "contract”, when used in the phrase "work * * * on the Contract”, necessarily presupposes the prior approval of the Comptroller.
 It is a well-established rule that existing law is part of every contract as fully as if it were expressly incorporated therein. (Von Hoffman v City of Quincy, 4 Wall [71 US] 535.) However, as Professor Williston has stated: "The law * * * is not a silent factor in every contract * * * in the sense that the statutory definitions govern the interpretation of every ambiguous phrase in a private agreement.” (4 Williston, Contracts [3d ed], p 323.)
The court’s primary function in interpreting a contract is to effectuate the intention of the parties as expressed by the language of the contract. This contract could have provided that the Comptroller’s approval was to mark the commencement of the contract’s "duration”, but it did not. If such were truly the State’s intention, the draftsmen failed to manifest it clearly. In view of the fact that this contract was prepared solely by the State, any ambiguity in the language thereof must be resolved to reflect what claimant reasonably understood the State’s language to mean, not necessarily what the State intended to say. (Heating Maintenance Corp. v State of New York, 206 Misc 605; Lenart Constr. v State of New York, 6 Misc 2d 473.) Actually, the State’s conduct belies any such intention since it sent in its surveyors prior to the Comptroller’s approval and thereby compelled Deverho to begin work as well.
The apparent intention of the definition of duration is to link the obligation to pay with the time when work is first performed. This is the interpretation which we adopt. There is no question that the work performed on May 21, 1974 was referable to the contract as "preparatory work”.[5] The State indicated that Deverho was obligated to comply with its request, and claimant did so for that reason and not voluntarily. This is crucial to our determination since claimant could not have triggered the running of the contract unilaterally. In that case, its actions would have been purely gratuitous. When the State demands performance, however, justice dictates that it be prepared to pay for it.
While this case presents an issue technically of interpreta *1061 tion, we have shunned a purely semantic solution. It is a fact of both statutory and contract construction that inquiring into the so-called "literal” meaning of words is fraught with peril. As Justice Holmes said in United States v Whitridge (197 US 135, 143): "the general purpose [of a statute] is a more important aid to the meaning than any rule which grammar or formal logic may lay down. Georgia Railroad & Banking Co. v. Smith, 128 U.S. 174, 181.” It is true that the lexical definition of a "contract” is, roughly speaking: a legally enforceable agreement. Nevertheless, we do not use this definition to make sense of such terms as "void contract”, "illegal contract”, or "ineffective contract”. To do so would render these terms self-contradictory. We do however ascribe definite meanings to them and understand them to refer to specific objects. Such paradoxes arise from considering words as isolated entities, instead of with reference to their grammatical and behavioral contexts. Conversely, distortions in meaning are likely to occur when the import of a writing is made to "depend upon an artificial meaning imposed by the law” (4 Williston, Contracts, p 324).
The central issue involved here is a practical one. The State possesses grossly disproportionate bargaining power compared to the contractors with which it deals. As John J. McNamara, Jr., stated in his classic work, The Court of Claims: Its Development and Present Role in the Unified Court System (40 St John’s L Rev 1, 41): "State contracts contain numerous exculpatory clauses which, if strictly construed, might well deny relief in most cases. The Court [of Claims] has, therefore, interpreted these contracts liberally in an attempt to accomplish substantial justice.”
It is a well-established principle of law that a "contract will not be construed as to put one party at the mercy of another. (Gillet v. Bank of America, 160 N. Y.. 549; Wilson & English Constr. Co. v. N. Y. C. R. R. Co., 240 App. Div. 479, supra.)” (Shore Bridge Corp. v State of New York, 186 Misc 1005, 1015.) Acceptance of the State’s position would, however, do precisely that. When the State demanded that Deverho perform certain work in advance of the Comptroller’s approval, Deverho knew that if it did so, it might never be paid. However, had it refused, it may well have feared that the contract’s approval would be jeopardized. The record indicates that such approval is not simply given pro forma; after the opening of bids, there is an evaluation period during which *1062 time the contractor must supply various proofs of its ability to perform. If the State demands that the contractor begin work during this hiatus, the contractor may reasonably fear that it will be considered uncooperative or intransigent if it refuses. In the present case, had Deverho stood on its rights and refused to comply with the State’s demand, it could not have been faulted. (See Town & Country Eng. Corp. v State of New York, 46 NYS2d 792.)[6] Yet, having yielded to the pressure placed upon it, claimant is entitled to payment as the contract provided.
The State has also argued that to sustain this branch of the claim would constitute a windfall to claimant. On the contrary, it was the State which sought a windfall by demanding work from Deverho at a time when the obligation to pay was purely contingent. The fact that claimant’s acts in furtherance of Basic Maintenance and Protection of Traffic were de minimis during this period is of no consequence. As previously indicated, the nature of the performance required under this item was basically of a negative character, that is, to prevent traffic accidents. Some days this required affirmative action and some days it did not. Under the contract, claimant was to be paid in either case. This is clearly indicated by the State’s payment for Basic Maintenance and Protection of Traffic between October 16 and December 20, during which time no work of any kind was performed with the exception of two hours on October 28, 1974.[7] Claimant ran the risk of incurring liability as soon as it began work, and the record indicates that it obtained insurance to cover the period in question. We also observe that the State never contended that claimant had failed to perform this item satisfactorily.
We hold, therefore, that the "duration” of the contract commenced on May 21, 1974, and that claimant is entitled to *1063 be paid for Basic Maintenance and Protection of Traffic from that day forward.
The second branch of the claim regarding item 619.01 concerns the period from October 16, 1974, the completion date of the contract, until December 20, 1974, the date of final acceptance. The contract provided that claimant was to complete performance on or before October 16, and that if it were anticipated that such would be impossible, an extension of time could be applied for as long as the application was made at least 15 days prior to the completion date. In the event that such an extension was required, the State could assess certain additional engineering charges.
The origin of the controversy is that seven days prior to the completion date, Mr. Porvaznik made an inspection and provided claimant with a "punch list” of what items remained to be done. It is undisputed that claimant performed all of the work indicated on this punch list by October 16. In fact, the diary of the work, kept by the State, shows an entry for October 16 which states: "Items on punch list are completed. Contract work is completed.” Subsequently, however, on October 23, 1974, another inspection was made by Mr. L. Leonard, the area supervisor, who determined that two additional items of work were required. This work was performed on October 28, 1974 and took two hours.
Approximately one month later, the State demanded that claimant sign a request for extension of time to cover the two hours of work. This form contained a provision that additional engineering charges could be assessed, although the State orally represented that no assessment would be made. The State took the position that until this form was signed, the contract could not be finally accepted or paid for, and claimant would remain responsible for continued maintenance on the project. Claimant contended that it was under no obligation to request an extension, and thereby incur the possibility of additional charges, since it had complied with the State’s punch list prior to October 16. Nevertheless, claimant eventually signed the form under protest, though deleting that portion which referred to engineering charges. The contract was finally accepted on December 20.
In the final audit of the contract, the State deemed claimant to be entitled to payment for Basic Maintenance and Protection of Traffic during the period from October 16 to December 20, but assessed a penalty of 46 days on the theory that final *1064 acceptance of the contract had been delayed by claimant’s unreasonable refusal to submit the extension of time form. The State’s witness, Mr. Albert Bauman, a regional construction engineer employed by the Department of Transportation, indicated that such a penalty had never before been imposed since no contractor had ever refused to submit a request for extension. No contract provision was cited by the State empowering it to impose such a penalty.
We hold that claimant had no obligation to sign the extension of time request in view of the possibility that it would result in additional charges being assessed. The State had an obligation to make its demands known to claimant prior to October 16. Insofar as this was done, by supplying claimant with a punch list, claimant fully complied. In view of the minimal quantity of additional work required by the State’s second inspection, the court has no doubt that this work could have been completed prior to October 16. In fact, the State admitted that some of the conditions which Mr. Leonard observed on October 23 may well have arisen after the completion date. It is therefore possible that the State’s delay in making its final inspection was the direct cause of some of the alleged deficiencies in performance.
The State argues that Mr. Leonard had numerous other jobs to inspect, and that his delay was therefore reasonable. Granting that Mr. Leonard was a busy man, the contractor’s refusal to incur additional liability for that reason was entirely justified.
We hold that on the first cause of action, claimant is entitled to payment for Basic Maintenance and Protection of Traffic from May 21, 1974 through December 20, 1974 at the contract rate of $130 per day for a total of 214 days. Claimant was paid for 139 days and is owed payment for 75 days. Accordingly, claimant is awarded the sum of $9,750 plus interest from March 20, 1975.[8]
Claimant’s second cause of action relates to contract item 619.08: watchmen patrols. Deverho was required to make at least one patrol every three hours during the period when the contractor’s operations were substantially closed down, and was paid at the rate of $3 per patrol. This item was subcontracted to the M. G. Darling Security Agency, Inc., *1065 which was paid at the rate of $1 per patrol. In the final audit of the contract, claimant was paid for 509 patrols; this cause of action seeks payment for 307 additional ones.
At trial, invoices from the subcontractor and corresponding checks from Deverho were received in evidence as proof that the additional patrols were made. The crucial question is whether these documents were sufficient to prove claimant’s cause of action. In this regard, the contract specifications provide at page 400: "Watchman’s service shall be computed for payment by the patrol for the number of patrols approved by the engineer, and in accordance with requirements A, B, or C as designated on the plans or in the proposal. A patrol shall be defined as a complete coverage of the contract from limit to limit, in such a manner that the watchman can observe any vehicle, person, or condition of construction on the contract site. A patrol shall include 'punching in’ at all designated points approved by the engineer.” (Emphasis added.)
Punching in is a procedure whereby the contractor provides a time clock containing a tape which is punched by the watchman during each patrol. Periodically, the State’s engineer inspects the tapes and payment is made on the basis of the information contained therein.
The State refused to pay for the patrols in question because Deverho failed to produce the appropriate tapes. On this subject, Nathaniel Gartman testified that Deverho had retained the time clock used on this job and had removed the tapes and thrown them away.
We hold that the contract specifications quoted above provided for the sole method by which claims for watchmen patrols were to be allowed. The State’s desire to provide for an objective record of patrols was entirely justifiable, since the patrols were performed when no one else was on the job. The opportunity for false claims and/or collusion was therefore great, and the State was entitled to protect itself by appropriate provisions in the contract. It did so by defining the performance required under this item to include "punching in”. Consequently, even if the invoices and canceled checks offered by claimant were admissible to show transactions between Deverho and its subcontractor, these documents did not indicate whether the watchmen actually punched in. In view of this fact, claimant failed to prove that it substantially performed its responsibilities under this item of the contract.
Analogizing to the law of evidence, the manifest intention of *1066 the "punching in” clause of the specifications was to render the tapes the best evidence of watchmen patrols. Since the production of a taped record was made an integral part of each patrol, the implication, is clear that, theoretically, a patrol was not to have an existence independent of the act of punching in. We therefore deem the tapes to have been "constituted the only evidence of the fact.” (Commonwealth v Dill, 156 Mass 226, 228; see, also, Mahaney v Carr, 175 NY 454; Tice v Reeves, 30 NJL 314.)
The destruction of the tapes was Deverho’s fault. The clearly foreseeable result was to prejudice the State’s ability to effectively audit this portion of the contract. Under these circumstances, secondary evidence was inadmissible to prove the patrols in question. (West v New York Cent. & Hudson Riv. R. R. Co., 55 App Div 464; People v Betts, 272 App Div 737.) Claimant thus failed to prove the elements of its second cause of action by a fair preponderance of the credible evidence.
CONCLUSION
For the first cause of action, claimant is awarded the sum of $9,750 plus interest from March 20, 1975.
Claimant’s second cause of action is dismissed.

. This claim originally contained four causes of action. The third cause of action was dismissed during trial for failure to prove a prima facie case, and the fourth cause of action was withdrawn.

. Standard Specifications of 1973 (p 53, par 105-10) states: "[t]he contractor shall furnish free of charge all stakes, templets, standard subgrade testers, straight edges, and such temporary structures as may be necessary for marking and maintaining points and lines for work, and is to give the engineer such facilities, labor, and materials for giving the lines and points as he may require." (Emphasis added.)

. Contract items 15201.06 (Clearing and Grubbing) and 699.01 (Mobilization).

. (See Standard Specifications of 1973, p 394, par 619-1.10.)

. See footnote No. 2 and definition of "duration” (Standard Specifications of 1973, p 394, par 619-1.10).

. In that case, the contractor filed a claim for unreasonable delay by the State, and the State contended that the contractor should have begun work as soon as the contract was awarded, but prior to the Comptroller’s approval. The court held that there was no obligation to do so. In the present case, the State raised a similar contention upon cross-examination of Mr. Gartman, who was asked the following question by the Assistant Attorney-General: "Could you explain why, if you are stating on April 30 is the award date, why didn’t you enter performance until the 21st, some twenty-one days after the alleged award, is there any reason for the excessive amount of time?” We can hardly accept the proposition that the contractor was required to begin work on April 30 in view of the State’s present position that it had no obligation to pay for such work.

. See infra.

. This date represents 90 days from final acceptance of the contract. (Highway Law, § 38, subd 7, par [g]; State Finance Law, § 16; CPLR 5001; Yonkers Contr. Co. v New York State Thruway Auth., 25 NY2d 1.)